UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

HILDA GOMEZ,

                                    Plaintiff,

                    -v-

COMMISSIONER OF SOCIAL SECURITY,

                                    Defendant.

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/18/16

14 Civ. 7207 (PAE) (FM)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

     Plaintiff Hilda Gomez, proceeding *pro se*, brings this action pursuant to § 205(g) of the

Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the

Commissioner of Social Security (the "Commissioner"), which denied Gomez's applications for

disability insurance benefits ("DIB") and supplemental security income ("SSI"). The

Commissioner has moved for judgment on the pleadings pursuant to Federal Rule of Civil

Procedure 12(c). Before the Court is the June 27, 2016 Report and Recommendation of the Hon.

Frank Maas, United States Magistrate Judge, recommending that the Court grant the

Commissioner's motion. Dkt. 16 ("Report"). For the following reasons, the Court adopts the

Report in full.

## I.    **Background**[1]

     Gomez, now age 44, worked as a child monitor from 1999 until 2008, and as a

housekeeper from November 2009 until September 2010. She claims that she became disabled

---

[1] The Court's summary of the facts is drawn from the detailed account of the facts provided in
the Report, to which neither party objects. The Court adopts in full the Report's recitation of the
facts.

on September 18, 2010, due to depressive disorder, post-traumatic stress disorder, hypertension, hyperlipidemia, insomnia, and lower back pain.

On June 16, 2011, Gomez filed an application for DIB.  On June 27, 2011, Gomez filed an application for SSI.  After the Social Security Administration denied her applications, she requested and was granted a hearing before an Administrative Law Judge ("ALJ").  On December 5, 2012, Gomez appeared and testified at a hearing before ALJ Lori Romeo, where she was accompanied by a client representative and an interpreter.

On January 25, 2013, the ALJ issued a decision concluding that Gomez was not disabled within the meaning of the Social Security Act.  The ALJ determined that while Gomez had several severe impairments, she nonetheless retained a residual functional capacity ("RFC") that would permit her to perform medium work in a low stress setting.  Based on her RFC and the testimony of a vocational expert, the ALJ determined that Gomez could not perform her past work as a child monitor, but that she was capable of performing her past work as a housekeeper.  On June 27, 2014, the Appeals Council denied Gomez's request for review of the ALJ's decision, making the ALJ's decision the Commissioner's final decision.

On September 9, 2014, Gomez commenced this action.  Dkt. 2 ("Complaint").  On January 5, 2015, the Court referred this case to Magistrate Judge Frank Maas.  Dkt. 6.  On August 7, 2015, the Commissioner filed a certified copy of the administrative record, Dkt. 13, and moved for judgment on the pleadings, seeking affirmance of the Commissioner's decision and dismissal of the Complaint, Dkts. 14, 15.  Gomez's response to the motion was due September 8, 2015.  To date, Gomez has not responded.

On June 27, 2016, Judge Maas issued the Report, recommending that the Court grant the Commissioner's motion for judgment on the pleadings.  Dkt. 16.  Based on a thorough review of

the ALJ's decision and the administrative record, the Report concluded that substantial evidence supported the ALJ's findings.  Report, at 18–33.

The deadline for the parties to file objections to the Report was July 14, 2016.  *See* Report, at 33 ("The parties shall have fourteen (14) days from the service of this Report and Recommendation to file written objections . . . .").  To date, no objections have been filed.

## II.    Discussion

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error."  *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks and citation omitted); *see also* 42 U.S.C. § 405(g).  "Substantial evidence means more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Burgess*, 537 F.3d at 127 (internal quotation marks and citation omitted).

In reviewing a Report and Recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).  "To accept those portions of the report to which no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record."  *Ruiz v. Citibank, N.A.*, No. 10 Civ. 5950 (KPF), 2014 WL 4635575, at *2 (S.D.N.Y. Aug. 19, 2014) (quoting *King v. Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL 2001439, at *4 (S.D.N.Y. July 8, 2009)); *accord, e.g.*, *Wilds v. United Parcel Serv.*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003).

Because neither Gomez nor the Commissioner has submitted objections to the Report, review for clear error is appropriate.  Careful review of Judge Maas's thorough and well-

reasoned Report reveals no facial error in its conclusions; the Report is therefore adopted in its entirety.  Because the Report explicitly states that "failure to file . . . timely objections will result in a waiver of those objections for the purposes of appeal," Report, at 34, the failure to object operates as a waiver of appellate review.  *See Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008) (citing *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam)).

**CONCLUSION**

For the reasons articulated in the Report, the Court grants the Commissioner's motion for judgment on the pleadings.  The Clerk of Court is directed to terminate the motion pending at docket number 14, and to close this case.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: July 18, 2016
        New York, New York

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:    6/27/16

---------------------------------------------------------x

HILDA GOMEZ,                            :       **REPORT AND
                                                RECOMMENDATION
                        Plaintiff,      :       TO THE HONORABLE
                                                PAUL A. ENGELMAYER**
      -against-                         :
                                                14cv7207-PAE-FM
COMMISSIONER OF SOCIAL                  :
SECURITY,
                                        :
                        Defendant.
---------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

Pro se plaintiff Hilda Gomez ("Gomez") brings this action pursuant to

Section 205(g) of the Social Security Act ("Act"), as amended, 42 U.S.C. § 405(g),

seeking review of a final decision of the Commissioner ("Commissioner") of the Social

Security Administration ("SSA") denying her applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI"). The Commissioner has

moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure. (ECF No. 14). For the reasons set forth below, the Commissioner's motion

should be granted.

I.    Background

      A.    Procedural History

            On June 16, 2011, Gomez filed an application for DIB, claiming she was

disabled as of September 18, 2010, due to depressive disorder, post traumatic stress

disorder ("PTSD"), hypertension, hyperlipidemia, insomnia, and lower back pain. (R. 56,

174-75, 205).[1]  On June 27, 2011, Gomez also filed an application for SSI.[2]  (Id. at 57,

176-80, 408-29).  After the Commissioner denied Gomez's applications initially, (id. at

59-70), she requested a de novo hearing before an Administrative Law Judge ("ALJ"),

(id. at 71-73), which was held before ALJ Lori Romeo on December 5, 2012, (id. at 32-

55).  A client representative attended the hearing with Gomez.  (Id. at 32, 35).  Following

the hearing, on January 25, 2013, the ALJ issued a written decision concluding that

Gomez was not disabled within the meaning of the Act.  (Id. at 13-31).  The ALJ's

decision became final on June 27, 2014, when the Appeals Council denied Gomez's

request for review.  (Id. at 1-6).[3]

       On September 9, 2014, Gomez commenced this action seeking review of

the Commissioner's final decision, (ECF No. 2 ("Complaint" or "Compl.")), and on

January 5, 2015, the case was referred to me, (ECF No. 6).  On August 7, 2015, the

Commissioner moved for judgment on the pleadings.  (ECF No. 14).  Gomez's opposition

papers were due by September 8, 2015.  (ECF Nos. 5, 11).  Despite the passage of the

better part of an additional year, none have been received.  Gomez therefore has waived

any response to the Commissioner's motion.

---

[1]     "R." refers to the certified copy of the administrative record filed by the
Commissioner.  (ECF No. 13).

[2]     SSI differs from DIB in that an SSI claimant must demonstrate financial need, but
need not previously have been insured for benefits.  The standards for determining disability
under both programs are the same.  See Barnhart v. Thomas, 540 U.S. 20, 24 (2003).

[3]     The Appeals Council ultimately denied Gomez's request for review on the merits,
despite originally having declared it untimely.  (See id. at 7-10, 243-45).

B.    Non-Medical Evidence

Gomez was born on December 8, 1971, making her thirty-eight years old as of her alleged onset date and forty-one years old at the time of the ALJ's decision. (R. 174).  She completed high school and college in her home country, the Dominican Republic.  (Id. at 38, 309, 321).  At the time of her hearing, she had been in the United States for seventeen years and lived with her thirteen-year-old son, who has Down Syndrome and attends a "special school." (Id. at 39-40).[4]  Although Gomez utilized the services of an interpreter at her hearing, she testified that she could speak, read, and write English "a little bit."  (Id. at 38-39).

Gomez previously had worked as a babysitter from approximately 1999 to 2008, and as a housekeeper in a beauty parlor from November 2009 through September 2010.  (Id. at 40-41, 309, 534).  She testified that she left her housekeeping job to care for her son, who was eleven years old at the time, because he became ill.  (Id. at 41).  At the time of the hearing, her primary source of income was public assistance and her son's disability payments.  (Id.).

Gomez testified that she had traveled alone to the hearing via train.  (Id. at 42).  She also routinely took the bus alone to her doctor's appointments.  (Id.).  She was able to dress herself, take care of her home, cook, and clean.  (Id.).  Although a home health attendant helped with her son five hours per day, she testified that she "primarily"

_____

[4]    Around the time of her applications for benefits, Gomez also lived with her then seventeen-year-old daughter.  (See id. at 188, 194, 211, 271, 536, 569).

3

handled his care herself, including dressing him, sending him to school, and putting him

to bed.  (Id. at 42-43, 49).  She entertained family in her home "once in a while," and

went to a church located across the street from her home.  (Id. at 43-44, 616, 798).

Gomez testified that she could not work because her "house was burned"

and she "lost everything," and because she was "very nervous . . . around people," had

panic attacks, and did not like noise.  (Id. at 42).[5]  When asked whether she agreed with a

treating psychiatrist's assessment that "the only reason" she could not work full time was

because she had to care for her disabled son, she responded, "[i]n part."  (Id. at 46).

When asked to describe the "other part," she responded:  "I cannot be surrounded by a lot

of people.  I don't feel well."  (Id. at 46-47).

C.     Medical Evidence

1.     Treatment Records

a.     Prior to Onset Date

Prior to her onset date, Gomez received treatment from clinicians at the

Brooklyn Hospital Center.  (Id. at 457, 601-13, 659-77).  Notably, on November 8, 2005,

treatment notes indicated that Gomez was "pre-op for gastric bypass surgery," and, on

December 23, 2005, that she weighed 227 pounds, although she was only five feet four

inches tall.  (Id. at 662-63).

---

[5]     On September 18, 2010, the stove in Gomez's apartment exploded and started a
fire.  Although Gomez was not home at the time, her son and his home health attendant were
forced to evacuate, and Gomez lost all of her possessions.  She identifies the date of the fire as
her disability onset date.  (See id. at 41, 174, 194, 727, 738).

On May 15, 2009, Gomez was referred to Arbor WeCARE ("WeCARE") in Bushwick, Brooklyn.  (Id. at 339-69, 457).[6]  At her intake interview, she denied any history of mental health issues, and reported that she was scheduled for gastric bypass surgery in three weeks.  (Id. at 340-41, 352).  Due to the pending surgery, a WeCARE physician determined that she was temporarily unemployable and placed her on a sixty-day wellness plan.  (Id. at 351-52).

Gomez underwent bariatric lap band surgery in May 2009, which she reported was "successful."  (Id. at 312).  Accordingly, at a follow-up appointment on July 13, 2009, WeCARE physician Myron Seidman, M.D., determined that she was employable without functional limitations.  (Id. at 316-27).  Gomez returned to WeCARE "for administrative reasons" on March 22, 2010.  (Id. at 304-15).  She complained of lower back pain, potentially due to lifting her disabled son, but again denied any history of mental health issues.  (Id. at 312).  Although she was employed by then as a part-time housekeeper, Dr. Seidman modified her status to "Employable with Minimal Accommodations 35 hours.  Limited standing, bending, lifting.  Low stress environment." (Id. at 313).  She also was referred for vocational rehabilitation services.  (Id. at 385).

---

[6]      WeCARE is a New York City Human Resources Administration public assistance program "designed to help low-income clients with medical and/or mental-health issues find employment."  Lewis v. Astrue, No. 11 Civ. 7538 (JPO), 2013 WL 5834466, at *11 (S.D.N.Y. Oct. 30, 2013).

b.    After Onset Date

From December 17, 2010, until December 30, 2011, Gomez received

treatment at the Brooklyn Center for Psychotherapy ("Brooklyn Center").  (Id. at 284-89,

328-37, 554-58, 720-54).  During her intake interview, Gomez stated that she had been

anxious and depressed since the apartment fire on September 18, 2010.  (Id. at 727, 733).

A social worker diagnosed PTSD and depression not otherwise specified, and assigned

her a Global Assessment of Functioning ("GAF") score of 52.[7]  (Id. at 726).  Psychiatrist-

in-charge Stavros Sarantakos, M.D., signed off on recommendations for a medication

referral and weekly individual psychotherapy.  (Id. at 556, 734-35).  On January 17, 2011,

Gomez was seen by a nurse practitioner, who also diagnosed PTSD and depression not

otherwise specified.  (Id. at 738-42).  Gomez was prescribed Ativan[8] and Prozac,[9] (id. at

752), and on January 14, 2011, began therapy with social worker intern Natalia Van

---

[7]    The GAF scale is a numeric scale ranging from 0 to 100 that clinicians formerly used to rate a patient's social, occupational, and psychological functioning.  See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., text rev. 2000) ("DSM-IV-TR").  The scale was introduced in the revised version of the DSM's third edition, id. at 12 (3d ed. rev. 1987), but was removed from the most recent edition, which was released in 2013, id. at 16 (5th ed. 2013) ("DSM-5").  "Making a GAF rating involve[d] picking a single value that best reflect[ed] the individual's overall level of functioning."  DSM-IV-TR at 32.  A score of 51 to 60 on the GAF scale reflect[ed] "moderate symptoms," which include[d] "flat affect and circumstantial speech" and "moderate difficulty in social, occupational, or school functioning," such as "few friends" or "conflicts with peers or co-workers."  Id.

[8]    Ativan (lorazepam) belongs to a group of drugs called benzodiazepines used to treat anxiety disorders.  See Ativan, www.drugs.com/ativan.html (last visited June 21, 2016).

[9]    Prozac (fluoxetine) is a selective serotonin reuptake inhibitors ("SSRI") antidepressant used to treat major depressive disorder.  See Prozac, www.drugs.com/prozac.html (last visited June 21, 2016).

Hissenhoven, (id. at 736-37).  Thereafter, Ms. Van Hissenhoven completed "update of

treatment" forms after approximately ninety-day intervals.  (Id. at 743-50).

Between January and June 2011, Gomez again was followed by staff at

WeCARE.  (Id. at 266-327, 338-533).  On January 10, 2011, Gomez met with an intake

specialist, (id. at 266-75), and was examined by Fazil Hussain, M.D., (id. at 276-83).

During her intake, Gomez indicated that she was "not interested in working" and "just

want[ed] a new place to live."  (Id. at 271, 275).  Dr. Hussain diagnosed Gomez with

depressive disorder, hypertension, hyperlipidemia, and insomnia, and placed her on a

ninety-day wellness plan "for further stabilization [of] depressive disorder and insomnia."

(Id. at 282).  Dr. Hussain further noted, however, that Gomez had no postural or

environmental workplace restrictions, except that she would require a "low stress

environment."  (Id. at 280-82).

Thereafter, both the Brooklyn Center and WeCARE monitored Gomez's

progress.  On March 14, 2011, although she was only a social worker intern, Ms. Van

Hissenhoven completed a "Treating Physician's Wellness Plan Report," in which she

indicated that Gomez was "depressed," "temporarily unemployable," and "need[ed] more

time."  (Id. at 286-87).  Accordingly, on March 23, 2011, Dr. Hussain extended Gomez's

wellness plan for another sixty days.  (Id. at 295-99).  At WeCARE's request, Dr.

Sarantakos completed a second Wellness Plan Report on May 18, 2011.  (Id. at 284-85).

He listed Gomez's diagnoses as depression and PTSD, and again indicated that additional

time was needed for her to resolve her psychological difficulties.  (Id.).  Thereafter, on

May 26, 2011, Dr. Hussain found that Gomez was "unlikely to be able to work within the

next 12 months due to the need for further management of unresolving depressive

disorder and PTSD." (Id. at 293).  Accordingly, on June 6, 2011, WeCARE sent Gomez

a letter which indicated she might be eligible for DIB/SSI, and requested that she report

for a non-medical appointment to fill out a benefits application.  (Id. at 533).

            After applying for benefits, Gomez continued to receive treatment at the

Brooklyn Center.  On July 14, 2011, Dr. Sarantakos listed a diagnosis of "[a]djustment

disorder with depressed mood, anxiety acute," and noted that "PTSD symptoms [we]re

still present."  (Id. at 328).  He indicated that Gomez had difficulty maintaining her

residence, communicating with family members, and handling work pressure, but no

other restrictions.  (Id. at 328-33).  On July 16, 2011, Gomez's medications were

switched to Zoloft[10] and Trazodone.[11]  (Id. at 753).  In a letter to the SSA dated August

10, 2011, Dr. Sarantakos further opined that "[i]f [Gomez] were employed, it would have

to be a part time job because she needs to care for her son, who has Down syndrome."

(Id. at 557).  On December 30, 2011, Ms. Van Hissenhoven completed a discharge

summary, in which she indicated that Gomez had benefitted from therapy, but was

moving to Harlem, and therefore could no longer attend treatment in Brooklyn.  (Id. at

---

[10]      Zoloft (sertraline) is an SSRI antidepressant that affects chemicals in the brain
that may be unbalanced in people with depression, panic, anxiety, or obsessive-compulsive
symptoms.  See Zoloft, www.drugs.com/zoloft.html (last visited June 21, 2016).

[11]      Trazodone is an antidepressant used to treat major depressive disorder.  See
Trazodone, www.drugs.com/trazodone.html (last visited June 21, 2016).

749-50). Ms. Van Hissenhoven also noted that Gomez was sleeping better, and that her

PTSD symptoms had diminished. (<u>Id.</u> at 749).

        In April 2012, Gomez saw Michael Correa, M.D., for an annual physical.

(<u>Id.</u> at 755-58). Her weight was 193 pounds, which Dr. Correa noted was obese. (<u>Id.</u> at

757). Dr. Correa assessed her with hyperlipidemia and hypertension, but found that she

was in a "good general state of health." (<u>Id.</u>). At a follow up appointment in October

2012, Gomez's weight had declined to 176 pounds, which Dr. Correa still noted as obese.

(<u>Id.</u> at 759). Dr. Correa also assessed "panic attack," "palpitations," and "cough." (<u>Id.</u> at

759-60). Again, however, he found Gomez to be in a "good general state of health." (<u>Id.</u>

at 759).

        Finally, after a several month lapse in mental health treatment, Gomez was

seen at the St. Luke's Roosevelt Department of Psychiatry Clinic ("St. Luke's") from

May 7 until October 17, 2012. (<u>Id.</u> at 798-873). At her initial appointment, Gomez

reported that while her symptoms had "decreased somewhat" with previous treatment,

they had "increased significantly" since she stopped that treatment. (<u>Id.</u> at 809). She

complained of decreased energy and interest, frequent weeping episodes, difficulty

concentrating, insomnia, racing thoughts, frequent flashbacks, increased startle reflex, and

being fearful "something might happen to her or someone might hurt her" if she left the

house. (<u>Id.</u> at 801). Luis Cerra, Ph.D., diagnosed Gomez with "Major Depressive

Disorder, Recurrent, Moderate," and rule out PTSD. (<u>Id.</u> at 809). He also noted that

Gomez's compliance with psychiatric treatment in the past had been "questionable."

(Id.).  Thereafter, Gomez saw Dr. Cerra again on May 29, July 25, August 27, and
September 26, 2012.  (Id. at 813-33, 845-53, 860-64).  During the last of these
appointments, Dr. Cerra noted that Gomez still had "episodes of sadness but [was]
sleeping well," and was "not completely cured," but was "future oriented and able to
identify distorted thoughts."  (Id. at 860).  His diagnoses remained the same.  (Id. at 863).

        Gomez also saw St. Luke's psychologist Karen Merns, Ph.D., in August
2012, and attended weekly group therapy sessions monitored by Dr. Merns from August
22 through October 17, 2012.  (Id. at 834-44, 854-59, 865-73).  After her second session,
Dr. Merns noted that Gomez's "friendly demeanor and broad smile are enabling her to
quickly integrate into group."  (Id. at 854).  On October 3, 2012, Gomez shared with the
group that "parenting and homemaking responsibilities constantly caused her stress . . .
[which] became intolerable and she ultimately opted out of workforce."  (Id. at 865).  At
the last of these sessions, Dr. Merns noted that Gomez was planning a trip to Las Vegas
for her daughter's graduation.  (Id. at 871).

### 2.    Consultative Reports

        On August 19, 2011, at the request of the SSA, Vinod Thukral, M.D.,
conducted a consultative physical examination of Gomez.  (Id. at 561-66).  Dr. Thukral
noted that Gomez self-reported diagnoses of hypertension, depression, and lower
backache, but that her X-rays were negative; he assessed "no limitations for sitting,
standing, pulling, pushing or any other such related activities."  (Id. at 563-64).

10

That same day, Jemour Maddux, Psy.D., conducted a consultative psychiatric examination. (Id. at 614-17). Although Gomez reported difficulty falling asleep and loss of appetite, she also indicated that these symptoms were controlled by treatment. (Id. at 614). She denied having "significant symptoms of depression, anxiety, or other emotional problems during the past few months," and reported that she had resigned from her last job in order to take care of her son. (Id.). Dr. Maddux diagnosed Gomez with depressive disorder not otherwise specified, but found that she was able to follow and understand simple directions and instructions, perform simple and complex tasks independently without supervision, maintain attention and concentration, maintain a regular work schedule, learn new tasks, make appropriate decisions, relate adequately with others, and appropriately deal with stress. (Id. at 616). Dr. Maddux concluded that Gomez's "stress-related problems" did not appear to be significant enough to interfere with her ability to function on a daily basis. (Id.).

On September 14, 2011, Robert F. Lopez, Ph.D., reviewed the record and completed Psychiatric Review Technique and Mental RFC Assessment forms. (Id. at 581-98). He found no areas of "marked" limitation, and "moderate" limitation with respect to only six dimensions of performance, all of which related to Gomez's ability to interact with others. (Id. at 595-96). Dr. Lopez concluded that Gomez's allegations of depression, insomnia, and PTSD were "credible, but not to the degree alleged." (Id. at 597). He further found that Gomez was "capable of following supervision, relating

11

appropriately to coworkers[,] and performing [substantial gainful activity]," although she might "be precluded from performing tasks requiring a high degree of stress." (Id.).

On September 27, 2011, an individual identified only as "Smalls, S." completed a Physical RFC Assessment form.[12] (Id. at 638-43). Smalls indicated that Gomez had no postural, manipulative, visual, communicative, or environmental limitations. (Id. at 639-41). Smalls also indicated, with respect to exertional limitations, that Gomez could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk with normal breaks for six hours in an eight-hour workday, and sit with normal breaks for six hours in an eight-hour workday. (Id. at 639).

On September 21, 2012, Gomez again saw Dr. Thukral. (Id. at 687-97). Although Gomez's self-reported diagnoses of hypertension, hyperlipidemia, depression, and panic disorder differed somewhat from her prior visit, Dr. Thukral assessed "no limitations for sitting, standing, bending, pulling, pushing, lifting, carrying, or any other such related activities." (Id. at 689).

Finally, also on September 21, 2012, Johanina McCormick, Ph.D., conducted a consultative psychiatric examination. (Id. at 678-86). Dr. McCormick diagnosed Gomez with depressive disorder not otherwise specified and panic disorder without agoraphobia. (Id. at 681). She assessed mild memory impairments due to anxiety and depression, and difficulties adequately relating with others and appropriately

---

[12]     This apparently is a reference to Sharlene Smalls, but her expertise, if any, remains unclear. See Scardura v. Astrue, No. 07 Civ. 5098 (RJD), 2009 WL 648611, at *4 (E.D.N.Y. Mar. 10, 2009).

dealing with stress, but found that Gomez could follow and understand simple directions and instructions, perform simple and complex tasks independently without supervision, maintain attention and concentration, maintain a regular work schedule, learn new tasks, and make appropriate decisions. (Id. at 680-81). Accordingly, Dr. McCormick concluded that, although the results of Gomez's exam were consistent with "psychiatric and cognitive problems," they did not appear to be significant enough to interfere with her ability to function on a daily basis. (Id. at 681).[13]

## II. Applicable Law

### A. Standard of Review

Under Rule 12(c) of the Federal Rules of Civil Procedure, judgment on the pleadings is appropriate when the material facts are undisputed and a party is entitled to judgment as a matter of law based on the contents of the pleadings. See, e.g., Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988); Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999).

The Act, in turn, provides that "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); see Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002). The term "substantial" does not require that the evidence be overwhelming, but it must be "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a

---

[13] Despite these findings, Dr. McCormick nevertheless suggested on a separate checklist that Gomez had no social functioning limitations. (Id. at 684).

conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

A district court is not permitted to review the Commissioner's decision de novo. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004). Rather, the court's inquiry is limited to ensuring that the Commissioner applied the correct legal standard and that her decision is supported by substantial evidence. See Hickson v. Astrue, No. 09 Civ. 2049 (DLI) (JMA), 2011 WL 1099484, at *2 (E.D.N.Y. Mar. 22, 2011). When the Commissioner's determination is supported by substantial evidence, the decision must be upheld, "even if there also is substantial evidence for the plaintiff's position." Morillo v. Apfel, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001). This means that the ALJ's factual findings may be set aside "only if a reasonable factfinder would have had to conclude otherwise." Brault v. Soc. Sec. Admin. Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis omitted) (quoting Warren v. Shalala, 29 F.3d 1287, 1289 (8th Cir. 1994)).

B.    Disability Determination

The term "disability" is defined in the Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "[W]hether a claimant is disabled or unable to work is a matter reserved for the Commissioner." Rodriguez v. Astrue, No. 02 Civ. 1488 (BSJ) (FM), 2009 WL 1619637, at *16 (S.D.N.Y. May 15, 2009) (citing 20 C.F.R. § 404.1527). In determining

14

whether a claimant is disabled, the Commissioner is required to apply the five-step

sequential process set forth in 20 C.F.R. §§ 404.1520 and 416.920.

> The Second Circuit has described this familiar process as follows:
>
> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [s]he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits h[er] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider h[er] disabled without considering vocational factors such as age, education, and work experience. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [s]he has the residual functional capacity to perform h[er] past work. Finally, if the claimant is unable to perform h[er] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d

464, 467 (2d Cir. 1982)); accord Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008).

The claimant bears the burden of proof with respect to the first four steps. DeChirico v.

Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998). If the claimant sustains their burden at

each of these steps, then the burden shifts to the Commissioner at step five. Poupore v.

Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

In assessing whether a claimant has a disability, the factors to be considered

include: "(1) the objective medical facts; (2) diagnoses or medical opinions based on

such facts; (3) subjective evidence of pain or disability testified to by the claimant or other[s]; and (4) the claimant's educational background, age, and work experience." Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980). When reviewing the medical evidence, the ALJ has the authority to select among conflicting opinions. Veino, 312 F.3d at 588. Thus, if there are genuine conflicts within the evidence, their resolution is a matter committed to the Commissioner's discretion. Id.

III. The ALJ's Decision

ALJ Romeo determined at Step One that Gomez had not engaged in substantial gainful activity since her alleged onset date of September 18, 2010. (R. 18). At Step Two, the ALJ determined that Gomez had five severe impairments – hypertension, hyperlipidemia, obesity, depression, and anxiety. (Id.). At Step Three, the ALJ found that Gomez's severe impairments did not meet or medically equal any listed impairments ("Listings") in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"). (Id. at 19-20). At Step Four, the ALJ determined that Gomez had the residual functional capacity ("RFC") to perform medium work, except that Gomez "require[d] a low stress setting defined as simple repetitive tasks in which she would not have to work with the public because of problems in social functioning and can be expected to complete 8 hours of production but not at a constant pace to accommodate her problems with extended concentration and attention." (Id. at 20-25). Based on Gomez's RFC and the testimony of a vocational expert, the ALJ found that Gomez could not perform her past relevant work as a "child monitor," but that she was capable of performing her past relevant work

16

as a "cleaner." (Id. at 25-26). Accordingly, the ALJ found that Gomez was not

"disabled" within the meaning of the Act at any time between her alleged onset date and

the date of the ALJ's decision. (Id. at 26).

IV.    Discussion

The question presented by Gomez's boilerplate Complaint is whether the

ALJ's determination that Gomez was not disabled between September 18, 2010 (her

alleged onset date), and January 25, 2013 (the date of the ALJ's decision), is legally

correct and supported by substantial evidence. (See Compl. ¶ 9). As set forth below,

notwithstanding the filing of this action, it is clear that the ALJ proceeded properly and

that her decision is supported by substantial evidence.

A.    Duty to Develop the Record

"Before determining whether the Commissioner's conclusions are

supported by substantial evidence, . . . [a court] must first be satisfied that the claimant

has had a full hearing under the regulations and in accordance with the beneficent

purposes of the Social Security Act." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009)

(internal quotation marks, ellipsis, and brackets omitted). An ALJ thus has an affirmative

duty to develop the administrative record before making a determination regarding a

disability claim. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996).

Here, ALJ Romeo satisfied her duty to develop the administrative record by

inquiring into Gomez's medical and work history during the hearing, as well as by

securing the relevant medical records from the Brooklyn Hospital Center, the Brooklyn

Center, WeCARE, Dr. Correa, and St. Luke's – i.e., all the providers that Gomez

identified. (See R. 208-10, 218-20, 235). Furthermore, although it would not be enough

to relieve the ALJ of her duty, it bears mention that Gomez appeared at her hearing with a

representative who indicated that the record was complete to the best of his knowledge.

(Id. at 32, 36).

      B.    Disability Analysis

      As noted previously, the ALJ analyzed Gomez's disability claim using the

mandated sequential evaluation process. Accordingly, the Court need only review those

steps where the ALJ made findings that arguably could be considered adverse to Gomez.

      1.    Step Two

      The second step of the sequential analysis requires the ALJ to assess the

medical severity of a claimant's impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii),

416.920(a)(4)(ii). An impairment is severe if it significantly limits the claimant's

physical or mental ability to perform basic work activities. Id. §§ 404.1520(c),

416.920(c). The ALJ does not consider the claimant's age, education, or work experience

at this step. Id. Moreover, because Step Two merely serves as a filter to screen out de

minimis disability claims, a finding of any severe impairment, whether attributable to a

single condition or a combination of conditions, is enough to satisfy its requirements.

Fortier v. Astrue, No. 10 Civ. 1688 (MRK) (WIG), 2012 WL 3727178, at *9 (D. Conn.

May 11, 2012) (citing Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987)).

ALJ Romeo found that Gomez's hypertension, hyperlipidemia, obesity, depression, and anxiety constituted severe impairments. (R. 18). On the other hand, the ALJ determined that Gomez's lower back pain, shortness of breath, and knee pain were not severe impairments. (Id.). Because the ALJ found at least one severe impairment, she correctly proceeded to Step Three of the analysis.

2.    Step Three

The third step of the sequential analysis requires the ALJ to determine whether the claimant has an impairment or combination of impairments that meets or medically equals one of the Listings in Appendix 1. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). The ALJ must base this decision solely on medical evidence, without regard to the claimant's age, education, or work experience. Id. §§ 404.1520(d), 416.920(d). If the ALJ finds that the claimant has an impairment that meets or medically equals a Listing, the claimant is considered disabled within the meaning of the Act. Id. §§ 404.1520(a)(4)(iii), (d); 416.920(a)(4)(iii), (d). If none of the claimant's impairments meet the criteria for any of the Listings, the ALJ must proceed to the next step of the analysis. Id. §§ 404.1520(e), 416.920(e) .

In her decision, ALJ Romeo found that Gomez did not have an impairment or combination of impairments that met or medically equaled any of the Listings in Appendix 1. In reaching this conclusion, she considered each of Gomez's five severe impairments in turn. (R. 19-20).

a.    Obesity

First, the ALJ evaluated Gomez's obesity pursuant to Social Security

Ruling ("SSR") 02-1P, as well as Listings 1.00(Q), 3.00(I), and 4.00(F), which refer,

respectively, to the potential impact of obesity on musculoskeletal, respiratory, and

cardiovascular impairments.  (Id. at 19); SSR 02-1P, 2002 WL 34686281 (Sept. 12,

2002); Appendix 1 §§ 1.00(Q), 3.00(I), 4.00(F).  These regulatory guideposts "consider

obesity to be a medically determinable impairment and remind adjudicators to consider its

effects when evaluating disability," and also "remind adjudicators that the combined

effects of obesity with other impairments can be greater than the effects of each of the

impairments considered separately."  SSR 02-1P, 2002 WL 34686281, at *1.

The ALJ concluded that Gomez's obesity did not meet or medically equal a

Listing because it did not "result in functional limitations." (R. 19).  This conclusion,

although stated tersely, is amply supported by the record and therefore sufficient.[14]  In

April and October 2012, treating physician Dr. Correa found Gomez to be in a "good

general state of health" despite being obese.  (Id. at 757, 759).  In addition, in January

2011, WeCARE physician Dr. Hussain determined that Gomez had no postural or

environmental workplace restrictions, despite weighing 201 pounds, (id. at 276, 280-82),

and, in July 2009, after her "successful" bariatric surgery, (id. at 312), WeCARE

---

[14]    As the Second Circuit has made clear, an ALJ need not spell out her analysis in
great detail, so long as the Court can clearly discern that there is substantial evidence in the
record to support her conclusion.  See Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 112
(2d Cir. 2010) (citing Berry, 675 F.2d at 469).

physician Dr. Seidman determined that she was employable without functional

limitations, (id. at 316-27). This uncontradicted evidence was more than sufficient for the

ALJ to conclude that Gomez's obesity did not, alone or in combination with other

impairments, meet or medically equal any of the Listings.

b.     Hypertension and Hyperlipidemia

Next, the ALJ considered Gomez's hypertension and hyperlipidemia. (Id.

at 19). Listing 4.00(H)(1) states that because hypertension "generally causes disability

through its effects on other body systems," the Commissioner will evaluate the condition

"by reference to the specific body system(s) affected." Appendix 1 § 4.00(H)(1).

Similarly, Listing 4.00(H)(7) states that because hyperlipidemia "can cause defects

throughout the body," the Commissioner will evaluate the condition "by considering its

effects on [the claimant]." Id. § 4.00(H)(7).

The ALJ concluded that Gomez's hypertension and hyperlipidemia did not

meet or medically equal either of these Listings because she was on medication for both

conditions and there was "no end organ disease noted." (R. 19). This conclusion also is

supported by substantial evidence. In January 2011, Brooklyn Center treatment notes

indicate that both of these conditions were controlled by medication. (Id. at 741).

Similarly, twice in 2012, treating physician Dr. Correa assessed hypertension and

hyperlipidemia, but nonetheless found that Gomez was in a "good general state of

health," (id. at 757, 759), and, in September 2012, Dr. Thukral, a consultative examiner,

indicated that Gomez reported no complications from her hypertension or hyperlipidemia,

(id. at 687). Moreover, the record contains no evidence that these conditions impaired

any other bodily systems. See, e.g., Rosado v. Astrue, 713 F. Supp. 2d 347, 362

(S.D.N.Y. 2010) (collecting cases finding that hypertension that did not affect other

bodily systems did not meet a Listing). Accordingly, the ALJ's determination that

Gomez's hypertension and hyperlipidemia did not meet or medically equal any of the

Listings is supported by substantial evidence.

c. Depression and Anxiety

Finally, the ALJ considered Gomez's depression and anxiety pursuant to

Listings 12.04 and 12.06. See Appendix 1 §§ 12.04 (depression), 12.06 (anxiety).

Listing 12.04 is met when the requirements of both paragraphs A and B or paragraph C

are satisfied. To fulfill the requirements of paragraph B, the claimant must experience at

least two of the following limitations: "[m]arked restriction of activities of daily living;"

"[m]arked difficulties in maintaining social functioning;" "[m]arked difficulties in

maintaining concentration, persistence, or pace;" or "[r]epeated episodes of

decompensation, each of extended duration." Id. § 12.04(B). Paragraph C is fulfilled

when there is a medical history of a "chronic affective disorder of at least [two] years'

duration that has caused more than a minimal limitation" in the performance of basic

work activities and one of the following: "[r]epeated episodes of decompensation, each

of extended duration;" a "residual disease process that has resulted in such marginal

adjustment that even a minimal increase in mental demands or change in the environment

would be predicted to cause the individual to decompensate;" or a history of one or more

years of "inability to function outside a highly supportive living arrangement." Id.

§ 12.04(C). Listing 12.06 is satisfied when the requirements in both paragraphs A and B

are met, or when the requirements in both paragraphs A and C are met. The Listing 12.06

paragraph B criteria are the same as the paragraph B criteria under Listing 12.04. Id.

§ 12.06(B). The Listing 12.06 paragraph C criteria require that the claimant's disorder

result "in complete inability to function independently outside the area of one's home."

Id. § 12.06(C).

The ALJ found that Gomez had "moderate" difficulties in social

functioning and with regard to concentration, persistence, or pace, but had no "marked"

restrictions and experienced no episodes of decompensation. (R. 19). Accordingly, the

ALJ concluded that Gomez failed to meet the paragraph B criteria for either Listing.

(Id.). There is substantial evidence to support this conclusion. Gomez testified that she

was able to travel independently, dress herself, cook, clean, take care of her disabled son,

entertain family, and go to church, (id. at 42-44), all of which support the conclusion that

she was not markedly limited in her activities of daily living. In addition, treating

psychiatrist Dr. Sarankatos assessed only "mild" difficulties in social functioning, (id. at

329), Dr. Maddux, a consultative examiner, indicated she could relate adequately with

others, (id. at 616), and Dr. Lopez, another consultative examiner, assessed only

"moderate" limitations in social functioning categories, (id. at 595-96). These findings,

combined with Gomez's own reports that she socialized with friends and/or family

members, (id. at 43, 541, 854), and her ability to integrate quickly into group therapy, (id.

23

at 854), support the conclusion that any limitations Gomez had with regard to social functioning were less than "marked." Similarly, Dr. Sarankatos assessed Gomez with no difficulties in maintaining concentration, persistence, or pace, (id. at 329), treating psychiatrist Dr. Cerra determined that Gomez was "future oriented and able to identify distorted thoughts," (id. at 860), and Dr. McCormick, a consultative examiner, indicated that Gomez could maintain attention and concentration, (id. at 680). These findings support the conclusion that Gomez was less than markedly limited in her ability to maintain concentration, persistence or pace. Finally, Gomez denied ever having been hospitalized for her anxiety or depression, indicating that she had not experienced any episodes of decompensation. (See id. at 614, 825).[15]

As the ALJ found, the evidence also failed to establish the paragraph C criteria for either Listing. (See id. at 19-20). With regard to Listing 12.04, there was no evidence in the record to suggest that Gomez suffered from (i) "[r]epeated episodes of decompensation" of "extended duration," (ii) a "residual disease process," or (iii) an "inability to function outside a highly supportive living environment." See Appendix 1 § 12.04(C). As noted previously, Gomez never was hospitalized for her anxiety or depression, and she testified that she lived at home and took care of her disabled son, not

---

[15]     Although the ALJ noted WeCARE case manager Jacqueline Lowe's determination that Gomez met the Paragraph B criteria for both Listings 12.04 and 12.06, (id. at 458), she did not err by giving it no weight because it was not a medical opinion and Ms. Lowe spent only three hours with Gomez before making her determination, (id. at 24-25); see also Concepcion v. Colvin, No. 12 Civ. 6545 (FM), 2014 WL 1284900, at *16 (S.D.N.Y. Mar. 31, 2014) (opinions not based on any clinical or laboratory techniques not entitled to any special weight under the regulations).

in any kind of supportive living environment.  (See R. 40, 329, 614, 825).  With regard to

Listing 12.06, there was no evidence to suggest that Gomez could not function outside of

her home.  See Appendix 1 § 12.06(C).  Indeed, she was able to take her son to

appointments, travel independently, and go to church.  (See R. 42-44, 539).

       In sum, because none of Gomez's severe impairments met or medically

equaled any of the relevant Listings, the ALJ correctly continued to Step Four of the

analysis.

       3.    <u>Step Four</u>

       At the fourth step of the sequential analysis, the ALJ must determine

whether the claimant's impairments prevent her from doing her past relevant work, taking

into consideration the claimant's symptoms to the extent that they are consistent with

objective medical evidence and other evidence.  20 C.F.R. §§ 404.1520(a)(4)(iv), (e)-(f);

404.1560(b)(2); 416.920(a)(4)(iv), (e)-(f); 416.960(b)(2).  In doing so, the ALJ must

determine the claimant's RFC, or what the claimant is able to do despite any impairments,

while considering relevant medical and other evidence from the case record.  <u>Id.</u> §§

404.1545(a)(1), (3); 416.945(a)(1), (3).  If the claimant can still perform her past relevant

work, either as it was or is performed in the general economy, the ALJ must find that the

claimant is not disabled.  <u>Id.</u> §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

       The analysis of a claimant's RFC involves a two-part inquiry.  First, the

ALJ must consider whether the claimant has a medically-determinable impairment that

could reasonably be expected to produce the pain or symptoms alleged.  <u>Sarchese v.</u>

Barnhart, No. 01 Civ. 2172 (JG), 2002 WL 1732802, at *7 (E.D.N.Y. July 19, 2002)

(citing SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996)); 20 C.F.R. §§ 404.1529(b),

416.929(b). Then, if the claimant makes statements about her symptoms that are not

substantiated by objective medical evidence, the ALJ must make a finding as to the

claimant's credibility and determine the extent to which her symptoms truly limit her

ability to perform basic work activities. Sarchese, 2002 WL 1732802, at *7; SSR 96-7p,

1996 WL 374186, at *1.

### a. RFC Determination

ALJ Romeo determined that Gomez retained the RFC to "perform medium

work . . . [,] except [that she] require[d] a low stress setting defined as simple repetitive

tasks in which she would not have to work with the public because of problems in social

functioning and can be expected to complete 8 hours of production but not at a constant

pace to accommodate her problems with extended concentration and attention." (R. 20).[16]

The ALJ also noted that, because of her "limited ability to speak and read English . . .

[Gomez] should be limited to simple tasks." (Id. at 25).

In support of her finding that Gomez retained the physical ability to perform

medium work, the ALJ referenced Gomez's successful lap band surgery, her lack of

difficulty ambulating, Dr. Thukral's 2011 and 2012 consultative examinations which

were "within normal limits," and the 2012 findings of treating physician Dr. Correa that

---

[16]     The Regulations define "medium work" as work which "involves lifting no more
than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."
20 C.F.R. §§ 404.1567(c), 416.967(c).

she was in a "good general state of health" despite ongoing obesity, hypertension, and

hyperlipidemia. (Id. at 21, 24; see also id. at 312, 316-27, 561-66, 687-90, 757, 759).

The ALJ's assessment that Gomez could perform medium work thus was plainly correct.

Indeed, the record arguably could support a less restrictive RFC determination. For

example, despite giving "significant weight" to Dr. Thukral's consultative opinion that

Gomez had "no limitations for sitting, standing, bending, pulling, pushing, lifting,

carrying, or any other such related activities," the ALJ nonetheless expressly gave Gomez

"the benefit of the doubt" by finding that her "impairments could cause mild pain that

supports the medium [RFC] assessment." (Id. at 22, 24; see also id. at 564, 689).

Turning to the impact of Gomez's mental impairments on her RFC, the ALJ

considered in detail Gomez's treatment at the Brooklyn Center from December 2010

through December 2011, and at St. Luke's from May through August 2012. (Id. at 22).

The ALJ noted that although these records reflected treatment for anxiety, depression,

insomnia, and related symptoms, they did not indicate that Gomez's mental impairments

had "significant" effects on her activities of daily living, social functioning, and

concentration. (Id.). Nonetheless, the ALJ found that Gomez's "depression and anxiety

cause[d] some social and concentration deficits that support nonexertional limitations."

(Id.). The ALJ also noted that the consultative examiners' reports "provide[d] further

support for the non-exertional limitations" set forth in her RFC determination, specifically

citing Dr. Maddux's 2011 report and Dr. McCormick's 2012 report, which she found to

be "consistent" with the objective evidence in the record. (Id. at 22, 24; see also id. at

614-17, 678-86). In fact, the ALJ once again downplayed the significance of a
consultative opinion – that of Dr. Lopez – which arguably supported a less restrictive
RFC determination. (Id. at 24; see also id. at 581-98).

        As noted above, the record is replete with objective and opinion evidence to
support the ALJ's conclusion that Gomez retained the RFC to perform medium work with
nonexertional limitations. Moreover, to the limited extent that the record contained
evidence that was not wholly consistent with her RFC determination, the ALJ provided
good reasons for rejecting that evidence. (See id. at 23-25).[17] Accordingly, the ALJ's
RFC determination does not provide any basis for this Court to remand this case.

                  b.    Credibility Analysis

        In making her RFC determination, the ALJ found that although Gomez's
medically determinable impairments could reasonably be expected to cause her alleged
symptoms, her "subjective complaints of pain, fatigue and panic which she alleges

---

      [17]    Most notably, the ALJ gave "little weight" to the countersignature of treating
psychiatrist Dr. Sarankatos on Ms. Van Hissenhoven's indication that Gomez was "temporarily
unemployable" because it was inconsistent with his own notes and conclusion that Gomez could
work only part time because of her need to care for her disabled son. (R. 24; see also id. at 287).
The "treating physician rule" only requires an ALJ "to grant controlling weight to the opinion of
the claimant's treating physician if the opinion is well supported by medical findings and is not
inconsistent with other substantial evidence." Rosado v. Barnhart, 290 F. Supp. 2d 431, 438
(S.D.N.Y. 2003) (citing 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2)). Although the
Commissioner must always provide "good reasons" for the weight she gives to the treating
source's opinion, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), the ALJ clearly did so here.
Moreover, an ALJ need not grant "controlling weight" to a treating physician's opinion as to the
ultimate issue of disability, as this decision lies exclusively with the Commissioner. See 20
C.F.R. §§ 404.1527(d), 416.927(d).

preclude[] her from the sustained performance of basic work activities [are] not fully

credible."  (Id. at 23).

Although the ALJ must "take the claimant's reports of pain and other

limitations into account, . . . she is not required to accept the claimant's subjective

complaints without question."  Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012)

(internal citations, quotation marks, and brackets omitted).  "Rather, the ALJ 'may

exercise discretion in weighing the credibility of the claimant's testimony in light of the

other evidence in the record.'"  Id. (quoting Genier v. Astrue, 606 F.3d 46, 49 (2d Cir.

2010)).

In making a credibility determination, an ALJ must consider

([i]) the claimant's daily activities; ([ii]) the location,
duration, frequency, and intensity of claimant's pain and other
symptoms; ([iii]) precipitating and aggravating factors; ([iv])
the type, dosage, effectiveness, and side effects of any
medication the claimant takes or has taken to alleviate the
pain or other symptoms; ([v]) any treatment, other than
medication, the claimant has received; ([vi]) any other
measures the claimant employs to relieve the pain or other
symptoms; and ([vii]) other factors concerning the claimant's
functional limitations and restrictions as a result of the pain or
other symptoms.

Kane v. Astrue, 942 F. Supp. 2d 301, 313 (E.D.N.Y. 2013) (citing 20 C.F.R.

§ 404.1529(c)(3)(i)-(vii)).  The ALJ need not discuss all the factors, however, "as long as

the decision includes precise reasoning, is supported by evidence in the case record, and

clearly indicates the weight the ALJ gave to the claimant's statements and the reasons for

that weight."  Felix v. Astrue, No. 11 Civ. 3697(KAM), 2012 WL 3043203, at *8

29

(E.D.N.Y. July 24, 2012) (citation omitted). Further, a federal court must afford great

deference to the ALJ's credibility finding so long as it is supported by substantial

evidence. <u>Bischof v. Apfel</u>, 65 F. Supp. 2d 140, 147 (E.D.N.Y. 1999); <u>see also</u>

<u>Gernavage v. Shalala</u>, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) ("Deference should

be accorded [to] the ALJ's determination [as to claimant's credibility] because [s]he

heard [claimant's] testimony and observed [her] demeanor.").

      Gomez alleged disability due to depressive disorder, PTSD, hypertension,

hyperlipidemia, insomnia, and lower back pain. (R. 205). At the time of her applications

for benefits, she stated that she had difficulty "concentrating for more than 15 minutes at

a time, recalling information, following written and spoken instructions, socializing,

sleeping for more than 2-3 hours at night, bending, sitting for more than 30 minutes at a

time, standing for more than 20 minutes at a time, walking for more than 2 blocks,

climbing more than 1-2 flights of stairs, lifting and carrying more than 10 lbs and

completing many tasks." (<u>Id.</u> at 211). She also reported experiencing frequent bouts of

crying and nightmares. (<u>Id.</u>). As ALJ Romeo correctly found, however, many of these

assertions are inconsistent with the other record evidence.

      Chief among the evidence that the ALJ relied upon in finding Gomez not

fully credible were her self-professed activities of daily living. (R. 23). Indeed, Gomez

testified that she was able to travel independently, dress herself, cook, clean, take care of

her disabled son, entertain family, and go to church. (<u>Id.</u> at 42-44). She also indicated in

2012 that she was planning a trip to Las Vegas for her daughter's graduation. (<u>Id.</u> at 871).

As the ALJ found, Gomez's "daily activities . . . [were] not limited to the extent one

would expect, given the complaints of disabling symptoms and limitations."  (Id.).  In

addition, the ALJ cited the "mild clinical and diagnostic signs described in the objective

medical evidence," "significant gaps in [her] history of treatment[,] . . . [and] suggestions

of noncompliance with medication . . . [, which] suggest[] that her symptoms are not as

severe as she purports."  (Id. at 23).  Furthermore, by the time of her hearing, Gomez

continued to complain only of difficulties related to her mental impairments, (id. at 42,

46-47), which she had repeatedly indicated improved with therapy and medication, (id. at

614, 749, 809, 860, 868).  In fact, as Gomez herself reported, she had stopped working

primarily to take care of her disabled son, which the ALJ correctly found to be

"meritorious," but "nonetheless unrelated to her own medical condition."  (Id. at 23, 40-

41, 614, 738, 865).

        "It is the function of the Secretary, not [the courts], to resolve evidentiary

conflicts and to appraise the credibility of witnesses, including the claimant."  Carroll v.

Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).  Thus, the only

question before the Court with respect to the ALJ's credibility determination is whether

her finding that Gomez's assertions concerning her limitations were "not totally credible"

is supported by substantial evidence in the record.  The ALJ gave clear reasons for her

credibility decision, and the objective and opinion evidence in the record in support of the

ALJ's RFC determination frankly is overwhelming.  Accordingly, the ALJ's credibility

analysis does not provide any basis for this Court to remand this case.

c.     Past Relevant Work

Finally, the ALJ concluded that Gomez was capable of performing her past

relevant work as a "cleaner" because it did not require the performance of work-related

activities precluded by her RFC.  (R. 25-26).  In reaching this conclusion, the ALJ

referred to the Dictionary of Occupational Titles ("DOT") entry for "Cleaner,

Housekeeping," which is generally classified as light, unskilled work.  The description of

this job is as follows:

> Cleans rooms and halls in commercial establishments, . . .
> performing any combination of following duties:  Sorts,
> counts, folds, marks, or carries linens.  Makes beds.
> Replenishes supplies, such as drinking glasses and writing
> supplies.  Checks wraps and renders personal assistance to
> patrons.  Moves furniture, hangs drapes, and rolls carpets.
> Performs other duties as described under CLEANER (any
> industry) I Master Title.

See DOT Job Code No. 323.687-014, 1991 WL 672783 (4th ed. 1991).  The ALJ also

solicited the testimony of a vocational expert, who testified that a hypothetical claimant

with Gomez's RFC could perform such work as it is generally performed in the regional

and national economies.  (R. 50-54).  As a result, the ALJ concluded that Gomez could

perform her past relevant work as a "cleaner" because it was "not above her physical

capacity and it accommodates [her] inability to work with the public as many cleaning

jobs are performed at night in offices when no one is present and it affords [her] the

opportunity to work at her own pace."  (Id. at 25-26).

32

At Step Four, "the claimant has the burden to show an inability to return to her previous specific job and an inability to perform her past relevant work generally." Jasinski v. Barnhart, 341 F.3d 182, 185 (2d Cir. 2003) (emphasis in original). Nothing in the record indicates that Gomez would be unable to return to her past relevant work. To the contrary, Gomez testified that, in part, she was unable to return to work because of her need to care for her disabled son. (R. 46-47, 324, 614, 738, 865). Accordingly, the ALJ correctly found that Gomez could do her past relevant work as a "cleaner," and therefore was not disabled at Step Four of the analysis.

V.    Conclusion

For the foregoing reasons, the ALJ's decision is both legally correct and supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings, (ECF No. 14), should be granted.

VI.    Notice of Procedure for Filing Objections to this Report and Recommendation

The parties shall have fourteen (14) days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Engelmayer, to my chambers at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Engelmayer. The failure

33

to file these timely objections will result in a waiver of those objections for purposes of appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).

        SO ORDERED.

Dated:      New York, New York
           June 27, 2016

                                        FRANK MAAS
                         United States Magistrate Judge

Copies to:

Hilda Gomez (via U.S. Mail)
418 West 17th Street
Apartment 7H
New York, New York 10011

Defense Counsel (via ECF)